598 A.2d 1341

**Opening of Ballot Box of the First Precinct of Bentleyville, Washington County, Pennsylvania et al.**

**Appeal of Yvonne K. ORSATTI, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Oct. 10, 1991.
Decided Oct. 15, 1991.

Paul A. Tershel, for appellant.

Dennis Makel, for appellees.

Before CRAIG, President Judge, DOYLE, J., and SILVESTRI, Senior Judge.

DOYLE, Judge.

This is an appeal by Yvonne K. Orsatti from an order of the Court of Common Pleas of Washington County which denied Orsatti's "Motion and Appeal From Report of the Recount Board" and declared Curtis L. Thompson, Orsatti's opponent for the Democratic nomination for the position of District Justice, to be the winner.

On May 21, 1991 the primary election was held. The election results were certified by the County Election Board on June 10, 1991. Those results were 1,042 votes for Thompson and 1,036 votes for Orsatti. On June 13, 1991 Orsatti filed a timely "Petition to Open Ballot Boxes and to Recount Votes" pursuant to Section 1701 of the Pennsylvania Election Code, (Code) Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. § 3261. Orsatti, in her petition, alleged fraud or error in the computation of the votes or the marking of the ballots. Section 1703 of the Code, 25 P.S. § 3263, permits such a petition to be filed before the certification of the returns and "no later than five (5) days after the completion of the computational canvassing of all the returns of the county by the county board...." Orsatti did not, however, file a petition with the trial court to contest

the election. Pursuant to Section 1756 of the Code, 25 P.S. § 3456, an election-contest petition must be filed within twenty days of the date of the election (in this case by June 10, 1991).

On June 18, 1991 the trial court ordered a recount which was held on June 26 through June 28, 1991. On July 2, 1991 the Recount Board filed its report and the common pleas court signed an order directing that the Election Board make corrections based upon the Recount Board's findings. Those findings reflected a final vote tally of 1,043 for Thompson and 1,036 for Orsatti.

On July 5, 1991 Orsatti filed her "Motion and Appeal" with the common pleas court seeking leave to file an election contest nunc pro tunc alleging, *inter alia,* impropriety with respect to certain absentee ballots and asserting that certain individuals registered as "Independents" who were given Democratic ballots [1] should have been permitted to testify as to how they voted and that their votes should have been voided because as Independents they were not entitled to vote for a partisan candidate in a primary election. The trial court held that Orsatti's appeal was untimely and declined to grant nunc pro tunc relief. It did, however, despite its ruling, consider certain challenges to individual votes (not at issue here) and awarded some to Orsatti and some to Thompson. The specific totals ultimately decided upon are not provided to us by the trial court in its opinion or by the parties in their briefs. However, Thompson was declared the winner (apparently by four votes as best we can determine). Because it declined to grant Orsatti's petition for an election contest nunc pro tunc, the trial court declined to void the votes of the four absentee voters although it had found that the signatures on the voters' certificates were not the same as those on the applications for the absentee ballots.[2] It did indicate that

1. Washington County uses the "punch-card" system of voting.

2. The court noted "it further appears that the same person who signed the applications was the person who signed Thompson's affidavit for circulation." Tr. ct. op. at p. 6.

had the appeal been timely it would have voided these ballots. Further, the court declined to hear testimony on how the six Independent voters had voted. Hence, their ballots were counted (it is, of course, totally unknown for whom these six had voted). Orsatti thereafter appealed to this Court from the trial court's order dismissing her appeal.

Preliminarily, we must decide whether the trial court correctly denied nunc pro tunc relief. Orsatti maintains that because the absentee ballots were fraudulently signed (we must assume that arguendo because of the trial court's opinion) she demonstrated such fraud which should justify granting her nunc pro tunc relief. However, the timeliness of an appeal goes to the jurisdiction of the Court and may not be extended absent fraud or a breakdown *in the court's operation* due to a default of its officers. *Altieri v. Pennsylvania Board of Probation and Parole*, 88 Pa.Commonwealth Ct. 592, 495 A.2d 213 (1985). Here, although there may have been fraud in the form of forged signatures in connection with the absentee ballots, there was no fraud or administrative breakdown on the part of the trial court or the Election Board. While the Board may have been deceived by the forgeries, this was not a breakdown in its administrative operations or a fraud on its part.[3] Orsatti in essence argues that raising the forgery issue before the Recount Board and the petitioning for appeal from that Board's determination was sufficient to justify nunc pro tunc relief via the separate and distinct proceeding of an election contest under Section 1756 of the Code. The Supreme Court disagrees. In *Horsham Township Election Case*, 356 Pa. 60, 51 A.2d 692 (1947), the losing candidate awaited the outcome of a recount petition and then attempted to file an election contest nunc pro tunc. The Supreme

3. We distinguish *Koch Election Contest Case*, 351 Pa. 544, 41 A.2d 657 (1945), cited by Orsatti. There a nunc pro tunc appeal was allowed because tally strokes had been erroneously transcribed from a work sheet to a tally sheet *by election board officials* and upon their discovery of this they neglected to open the ballot box for a recount or publicly announce the final election results.

Court held that there was no basis for nunc pro tunc relief on those facts. *Horsham* clearly controls here.

Additionally, Section 1703(b) of the Code addresses this problem. It states:

No order or decision of the court under the provisions of sections 1701 and 1702 [pertaining to recanvassing] of this act, shall be deemed a final adjudication regarding the results of any primary or election, so as to preclude any contest thereof under the provisions of this article, and no such order or decision shall affect the official returns of any election district, unless a petition to open the ballot boxes or to recanvass the votes on a voting machine shall have been presented before the certification of the returns of the county by the county board, or unless a contest shall have been instituted in the manner provided by this article.

Since Orsatti did not file her petition to open before the returns were certified or timely file an election contest, she is not entitled to relief.

■ While our disposition of this issue makes it unnecessary to consider the substantive questions raised by Orsatti, because of the possibility of further appeal and the exigencies attendant to an election case, we shall do so. As to the issue of forgeries on the applications for absentee ballots, the trial court found such forgeries to have occurred. Section 1302(d) of the Code, 25 P.S. § 3146.2(d), clearly requires the voter (unless he or she is in the military and no such assertion was made here) to sign the application for an absentee ballot. Upon having found Section 1302 of the Code to have been violated, the trial court (had the appeal to it been timely) would have acted properly in voiding those votes. *Accord Canvass of Absentee Ballots of November 2, 1965, General Election,* 39 Pa.D. & C.2d 429 (1965) (absentee ballot application not totally completed by voter but partially filled in by another person—challenge sustained); *Fogelman Appeal,* 36 Pa.D. & C.2d 426 (1964) (absentee voter's declaration had no witness signature al-

though she signed the application for a ballot—challenge sustained).

■ Finally, we reach the question of whether the trial court erred when it refused to permit voters registered as Independent to testify as to how they voted in the Democratic primary. Initially, we note that the issue here is not one involving the right against self-incrimination as no Independent voter has asserted such right. Rather, the question is whether the constitutional mandate that "secrecy in voting be preserved"[4] applies where individuals registered as Independent vote for a partisan candidate in a primary election. Judge Woodside in *Thomas A. Crowley—Election Contest*, 57 Dauphin Co. Rep. 120 (1945), engaged in a scholarly analysis of the issue of secrecy in voting. He reviewed a multitude of cases and concluded that testimony regarding how one voted is permitted, even required, where evidence first shows that the individual was not entitled to vote because of such circumstances as being a foreigner, a non-resident or not having paid taxes (when such was required). In essence, where the vote is actually illegal because one is not entitled to vote, testimony may be compelled. As Judge Woodside explained:

> The procedure in [the cases cited in his opinion] was to show that certain people were not legal voters. After this was shown evidence was admitted as to how they voted in order that their illegal vote could be removed from the return. In determining this it has been held proper to call the person who cast the illegal vote and compel him to testify how he voted.

*Id.* at 125. If, however, it is determined that the elector is entitled to vote, he cannot be compelled to testify and cannot be permitted to waive his right to secrecy. Judge Woodside explained:

> This is sound public policy. It is to prevent intimidation and bribery. When a person has the right to reveal how he voted he can be intimidated into revealing it. Hitler

4. Pennsylvania Constitution, Article VII, Section 4.

came to power in Germany under a law which permitted the electorate to choose whether they would vote privately or publicly. In other words, they could waive their right to vote secretly. We are told that approximately 98% were intimidated to waive the secrecy of their ballot and vote publicly. If in every close election in this Commonwealth voters could be subpoenaed into Court, as they were here, and asked how they voted, bribery and intimidation would become a simple matter, even though the witness after taking the stand would have the legal right to refuse to answer the question.

The sanctity of the ballot must be preserved, and the courts must throw no technicalities in the way of discovering false or fraudulent election returns, but neither can we abandon the keystone of our democracy—the secrecy of the ballot, on the pretense of discovering an error in the return.

*Id.* at 126–27.

We believe that because an Independent voter cannot vote for any partisan candidate in a primary election [5] his vote is an illegal one. The individual who registers Independent has (like a foreigner) no right to vote for any partisan candidate at all in a primary election. Therefore, his vote may be ascertained so that it can be deducted from the total. Thus, were we to reach the merits we would be forced to order a remand for evidence to be taken on how the Independent voters voted.[6]

---

**5.** Section 1210(a) of the Code, 25 P.S. § 3050(a), requires that an election officer "at primaries [enter] a letter or abbreviation designating the party in whose primary [the voter] votes." Further, Section 1216(c) of the Code, 25 P.S. § 3056(c) directs, "At primaries, before a voter is admitted to the voting machine it shall be adjusted by the election officer in charge thereof, so that such voter will only be able to vote for the candidates of the party in which he is registered and enrolled and for candidates for nonpartisan nomination, if any."

**6.** We do not consider here the few individual challenges which, as noted earlier, the trial court inexplicably awarded (or subtracted) despite having found Orsatti's petition untimely. We do not consider these challenges because (1) Thompson has filed no cross-appeal and (2) the issue was not briefed by either party.

Based upon the foregoing discussion, we affirm the order of the common pleas court.

## ORDER

NOW, October 11, 1991, the order of the Court of Common Pleas of Washington County in the above-captioned matter is hereby affirmed. Opinion to follow.